Gilbert BLESSITT, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

March 1, 1957.

J. W. Jones, Burlyn Pike, Shepherdsville, for appellant.

Jo M. Ferguson, Atty. Gen., David B. Sebree, Asst. Atty. Gen., for appellee.

SIMS, Judge.

Appellant, Gilbert Blessitt, was convicted of the common law offense of maintaining a public nuisance in operating a garbage dump, and his punishment was fixed at a fine of $500 and 30 days in jail. The trial court also entered an order directing appellant to abate the nuisance although he had not owned the land or operated the dump for more than eight months prior to his trial and conviction. On his motion for an appeal appellant seeks to reverse the judgment because: 1. The court erroneously instructed the jury; 2. the evidence does not sustain his conviction.

■ One instruction of which appellant complains authorized punishment by a fine in any sum not exceeding $5,000 or by imprisonment not exceeding 12 months, or by both such fine and imprisonment in the reasonable discretion of the jury. This is the punishment prescribed by KRS 431.075 for common law offenses where no specific punishment is fixed by statute. Since this is a common law offense and no other statute fixes the punishment, the instruction was correct.

■ Appellant further complains that the second instruction defined " 'Wilfully' as used in the first instruction means the intentional doing of acts known by the defendant to be wrong," when in fact the court did not use the word "wilfully" in the first instruction but instead used "unlawfully and habitually." It was not necessary for the court to use "wilfully" in the first instruction nor to define it in the second, but as the instructions must be read as a whole, it is patent appellant was not prejudiced by the second instruction.

To determine whether the proof supports the conviction it is necessary to give a brief resume of it. Appellant was a farmer and lived in a community where for years the public had been dumping garbage from a bridge into Pond Creek, as well as in ditches along the public road. Briar Creek cut off a small strip of appellant's land and he conceived the idea of changing its channel into Pond Creek and filling up the old channel so he could get to this small strip with his tractors. He asked the adjoining landowner and his neighbor, William Hollis, if he wanted to go in with

him and change this channel, which invitation Hollis declined.

In 1954, appellant cut the trees and bushes along Briar Creek and changed its channel. In order that his neighbors might have a place to dump their garbage and to fill up the old creek bed, appellant told them they might dump their garbage without charge in the old creek bed. He permitted regular garbage haulers to dump in the old creek bed for $3 a load in order to help him defray the expense of having the garbage buried with a bulldozer, which machine cost him $10 an hour. Appellant asked his neighbors if they had any objection to his establishing this dump, which nobody did. Furthermore, he told his neighbors if the operation became objectionable, to let him know and he would shut down the dump.

When he cut the timber and bushes from the creek bank he burned it by piling thereon old automobile tires and refuse which had been dumped in the old channel. Also, appellant at other times burned the dry stuff from the dump in the old creek bed before covering with a bulldozer the part which would not burn. These fires caused smoke with a disagreeable odor, but nobody complained to appellant.

In the winter of 1955, rains started, the ground became soft and appellant's bulldozer man could not get the machine to the dump to cover the garbage. A truck or two hauling garbage got stuck in the mud trying to reach the dump and he allowed two loads of garbage to be dumped in his field. To keep other trucks out while it was wet, appellant put a sign on his gate, "No Dumping." This did not stop people from driving in and dumping garbage, so he put a chain around the gate and locked it. Thereupon, unknown to appellant, someone removed the gate from its hinges, trespassed on his farm and dumped garbage. Appellant allowed no dumping on his land in 1955.

Nobody complained to appellant, but he was having so much trouble keeping people off the land where they had been dumping the previous year, that on March 7, 1955, he leased the 31 acres on which the dump was located to Grady Dunn to be used as a junk yard. In May 1955, complaint was made to appellant about the odor and smoke from the burning of refuse in the junk yard. Appellant went to Dunn and requested him to shut down his junk yard but Dunn replied that his rent was paid and he had obtained "from the court" a permit to operate his junk yard and he was going to continue it. On June 2, 1955, appellant sold to Dunn the 31 acre tract upon which the junk yard was located.

A flood came in the winter of 1955 which caused refuse from appellant's dump to wash onto the land of Hollis, who sued appellant for $7,500 damages. The date this action was filed is not shown in the record but appellant testified nobody complained to him about the dump until May 1955, and his testimony on this point is not controverted. During the flood, refuse from the dumping by the public at the Paulley Gap Bridge could have washed on Hollis' land. Also, refuse from a dump operated by Virgil Knott for a few weeks about three-quarters of a mile up the creek from appellant could have washed onto Hollis' land. However, Knott testified he had a fence to keep refuse from washing off his dump, and Hollis testified he saw the refuse coming from appellant's land onto his.

Hollis' home was from 500 to 750 yards from appellant's dump and was nearer thereto than that of any witness testifying for the Commonwealth. The homes of most of the witnesses for the Commonwealth were from one to two miles from the dump. Most of them testified they were greatly annoyed by the smoke and stench from the dump, although several stated it did not annoy them and one witness testified he did not know whether the foul odor was from a distillery, a cattle pen or from the dump. While some of the annoyance was in 1954 and in the spring of 1955, most of it occurred after June 2, 1955, the date appellant sold the land to Dunn. The trial judge attempted to confine the testimony as

to what occurred before appellant sold the land to Dunn and undertook to prevent the witnesses from testifying about garbage falling off the trucks onto the public road while they were going to the dump, but much evidence got to the jury as to these occurrences.

The weakness in the Commonwealth's case is that despite the fact appellant told his neighbors when he started the dump he would shut it down if it annoyed them, nobody complained to appellant that the smoke and stench from his dump was annoying them until in May before he sold on June 2, 1955, the land upon which the dump was located. In the absence of a statute, ordinarily one committing a nuisance does not have to be notified of that fact before he can be prosecuted, 66 C.J.S., Nuisances, § 162, p. 967, and ordinarily one need not have criminal intent to make him guilty of committing a nuisance, 66 C.J.S., Nuisances, § 10, p. 750. But in the peculiar circumstances presented in this record where appellant asked permission of his neighbors to start the dump and informed them he would desist if it became annoying, simple justice demands that his neighbors should have notified him the dump was becoming a nuisance and given him an opportunity to abate same before subjecting him to prosecution.

The Commonwealth relied upon Old Lewis Hunter Distillery Co. v. Com., 273 Ky. 316, 116 S.W.2d 647, and Montgomery v. Com., 306 Ky. 275, 207 S.W.2d 27, to support its argument that a landlord is liable for a nuisance committed by his tenant on the leased premises regardless of whether the landlord had knowledge of the nuisance. In the Distillery case the landlord had notice before leasing the premises that they would be used in such a manner as to create a nuisance, while in the instant case none of the neighbors of appellant had complained about the dump before he leased the land to Dunn on March 7, 1955. As soon as appellant received notice that Dunn's operations were causing annoyance to the public, he tried to get Dunn to cease. In these circumstances appellant did all that could be expected of him to stop his tenant, hence the instant case is distinguished from the Distillery case.

Nor is the Montgomery case in point. That was an action to enjoin a landlord from permitting gambling on the premises by the tenant. There, the action might be said to take effect in futuro, and naturally the landlord would not need notice of the nuisance when all he was called on to do was to prevent his premises from being used henceforth in such a manner as to cause a nuisance. Here, had an injunction been sought against appellant to have him prevent his tenant Dunn from continuing to operate the junk yard, clearly appellant would not have been entitled to notice that the leased premises were being so used as to make them objectionable to the public.

Appellant was tried in March 1956, on an indictment returned June 27, 1955. He had on June 2, 1955, sold the land on which the junk yard was located and the trial judge recognized the good faith of this sale because he attempted to limit the Commonwealth's evidence to acts and occurrences prior to June 2, 1955. It was clearly erroneous for the trial judge to enter an order on March 8, 1956, requiring appellant to abate the nuisance on land which he had not owned for eight months and over which he had no control during that time.

For the reasons given, the motion for appeal is sustained, the judgment is reversed with directions that should the evidence be the same on another trial, a verdict will be directed in favor of appellant.